IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 4:23CR3047 |
| vs. | |
| CHARLES CRAWFORD, | MEMORANDUM AND ORDER |
| Defendant. | |

This matter is before the Court on Defendant's Objection to the Magistrate Judge's Findings and Recommendation (Filing No. 107.) For the reasons explained below, Defendant's Objection will be overruled, and Defendant's Motion to Suppress (Filing No. 42) will be denied.

## BACKGROUND

On May 16, 2022, Hall County, Nebraska Sheriff's Deputy Draper Sullivan ("Deputy Sullivan") was on patrol and observed a residence located at 123 W. 13th Street, Grand Island, Nebraska (the "Residence"). (Filing No. 62.) Deputy Sullivan testified that knew at the time that the Residence was associated with drugs, individuals with outstanding warrants, and that the Residence housed individuals who were known drug users and distributors. (Filing No. 62.) Also, four days before—on May 12, 2022—Deputy Sullivan had attempted a traffic stop on a vehicle that had just left the Residence, but the vehicle fled and Deputy Sullivan was unable to perform the traffic stop. (Filing No. 62.)

While surveilling the Residence on May 16, 2022, Deputy Sullivan saw Defendant's vehicle parked in the driveway. (Filing No. 62.) He witnessed an individual on a bike approach Defendant's vehicle, speak with Defendant and another person who was also outside Defendant's vehicle, and then leave. (Filing No. 62.) Deputy Sullivan left the area but a short time later he observed Defendant's vehicle leave the Residence. (Filing No. 62.) Deputy Sullivan then pulled behind Defendant's vehicle and noticed that the state and registration decal on the vehicle's license plate was fully obstructed from view. (Filing No. 62.) Deputy Sullivan decided to initiate a traffic stop. (Filing No. 62.)

Deputy Sullivan made contact with Defendant and requested his license, registration, and proof of insurance. (Filing No. 60, Ex. 1; Filing No. 62.)[1] Defendant refused to provide the information and asked why he was stopped. (Filing No. 60, Ex. 1; Filing No. 62.) Deputy Sullivan told Defendant his license plate was obstructed. (Filing No. 60, Ex. 1; Filing No. 62.) Defendant asked Deputy Sullivan if he could show Defendant the license plate and what was wrong with it. (Filing No. 60, Ex. 1; Filing No. 62.) Deputy Sullivan indicated he would, but Defendant just stayed in his car. (Filing No. 60, Ex. 1; Filing No. 62.) Deputy Sullivan asked if Defendant was going to get out of the car and Defendant indicated he would just give him his license, which was in his back pocket. (Filing No. 60, Ex. 1; Filing No. 62.) At this point, Deputy Sullivan told Defendant to get out of the car and opened Defendant's car door. (Filing No. 60, Ex. 1; Filing No. 62.)

Defendant eventually got out of the car and handed Deputy Sullivan his driver's license. (Filing No. 60, Ex. 1; Filing No. 62.) Deputy Sullivan then asked Defendant for his registration and insurance, which Defendant indicated was in his phone. (Filing No. 60, Ex. 1; Filing No. 62.) Deputy Sullivan then had Defendant walk-back with him to the back of Defendant's vehicle to show him the license plate and how it was obstructed. (Filing No. 60, Exs. 1, 6; Filing No. 62.) Deputy Sullivan and Defendant talked about this for a few moments and then Deputy Sullivan took Defendant's arm and placed his hands on the back of Defendant's truck and retrieved a firearm from Defendant's pocket. (Filing No. 60, Exs. 1, 6; Filing No. 62.) Deputy Sullivan placed the gun on the hood of his cruisier. (Filing No. 60, Exs. 1, 6; Filing No. 62.) As Deputy Sullivan was placing the gun on the hood of the cruiser, Defendant told Deputy Sullivan he should get the other one. (Filing No. 60, Ex. 1; Filing No. 62.) Deputy Sullivan retrieved another gun from Defendant's other pocket. (Filing No. 60, Exs. 1, 6; Filing No. 62.) Deputy Sullivan seized both guns—which were loaded. (Filing No. 60, Ex. 1; Filing No. 62.)

Deputy Sullivan then placed Defendant in handcuffs and requested a serial number check on the guns and a criminal history check on Defendant. (Filing No. 60, Exs. 1, 2; Filing No. 62.)

---

[1] The Court notes that the video evidence (Deputy Sullivan's body worn camera footage and in-car recording) was received as Exhibit Nos. 1-6 at the initial hearing. Video evidence, including body worn camera footage from Deputy Sullivan and other officers, as well as the in-camera recording, was admitted at the supplemental hearing as Exhibit Nos. 101 and 102. Exhibit 101 consists of Defendant's expert witness's compilation of videos from the traffic stop. Exhibit 102 consists of all officers' body worn camera footage, and all of Deputy Sullivan's in-car video footage.

As they were waiting for the criminal history check to be completed, Deputy Sullivan asked for consent to search the vehicle—which Defendant denied. (Filing No. 60, Ex. 2; Filing No. 62.) Deputy Sullivan—who was a K-9 handler—deployed his K-9. (Filing No. 60, Ex. 2; Filing No. 62.) The K-9 did not alert on the vehicle. (Filing No. 60, Exs. 2, 3; Filing No. 62.)

Deputy Sullivan testified that as he was performing the K-9 sniff, he observed part of what he thought was a plastic vacuum sealed package in an open green backpack on the front passenger seat of the vehicle. (Filing No. 62.) After returning his K-9 to the patrol car, and while still waiting the records check to be returned, he checked his computer to see if Defendant had any recent contacts with law enforcement. (Filing No. 60, Exs. 2, 3; Filing No. 62.) Deputy Sullivan learned that within two weeks of the stop, Defendant had been contacted by another Hall County Sheriff's Deputy while with an individual known to use narcotics, and there was a report that Defendant could be concealing narcotics in a subwoofer box in his vehicle. (Filing No. 62.)

Deputy Sullivan testified that he then returned to the vehicle and observed the suspicious package from various angles through the windows. (Filing No. 62.) He testified that he knows from his training and experience that this type of vacuum sealed packaging is used to package narcotics. (Filing No. 62.) He further testified that he saw a small amount of fine white crystalline power collected in the seams and folds of the packaging which he knew, based on his training and experience, to be narcotics. (Filing No. 62.) Deputy Sullivan then retrieved gloves from his cruiser, opened the driver's side door of Defendant's vehicle, and retrieved the package. (Filing No. 60, Ex. 4; Filing No. 62.) After that, he immediately radioed dispatch that he had located narcotics. (Filing No. 60, Ex. 4; Filing No. 62.) Deputy Sullivan searched the vehicle and located another container which contained methamphetamine, as well as other contraband items. (Filing No. 60, Exs. 5, 6; Filing No. 62; Filing No. 125, Exs. 101, 102.) Dispatch then advised that Defendant had prior felony convictions, and Defendant was arrested and transported to Hall County Corrections. (Filing No. 60, Exs. 5, 6; Filing No. 62; Filing No. 125, Exs. 101, 102.) Defendant's vehicle was later towed by the Hall County Sheriff's Department. (Filing No. 60, Ex. 11.)

On April 19, 2023, Defendant was indicted for possession with intent to distribute 50 grams or more of methamphetamine, possession of a firearm in furtherance of a drug trafficking crime, and felon in possession of a handgun. (Filing No. 1.) Defendant subsequently filed the pending

Motion to Suppress. (Filing No. 42.) An evidentiary hearing regarding the Motion to Suppress was held before the Magistrate Judge on March 6, 2024. (Filing No. 57.) At the hearing, two sources of video footage of the traffic stop was offered into evidence. (Filing No. 60, Exs. 1-6.) This included video evidence from Deputy Sullivan's cruiser, which was parked behind Defendant's vehicle and captured events through the front windshield (Filing No. 60, Ex. 6), and footage from Deputy Sullivan's body worn camera ("BWC"). (Filing No. 60, Exs. 1-5.) The BWC footage consisted of five separate files. (Filing No. 60, Exs. 1-5.)

The Magistrate Judge subsequently issued a Findings and Recommendation, recommending that the Motion to Suppress be denied. (Filing No. 63.) The Magistrate Judge concluded that Deputy Sullivan had probable cause to seize the bag and search Defendant's vehicle pursuant to the automobile exception after he saw a vacuum sealed bag containing methamphetamine residue in plain view through the vehicle's window. (Filing No. 63.) The Magistrate Judge further concluded that Deputy Sullivan had probable cause to search the vehicle based on the totality of the circumstances. (Filing No. 63.) In particular, the Magistrate Judge noted that prior to the traffic stop, Deputy Sullivan had been monitoring the Residence, and that Deputy Sullivan knew the Residence was associated with drugs, individuals with outstanding warrants, and housed individuals who were known drug users and distributors. (Filing No. 63.) Deputy Sullivan had also observed Defendant's vehicle in the driveway of the Residence, and shortly before the traffic stop, observed Defendant engage in an interaction that was consistent with a "hand-to-hand" drug transaction. (Filing No. 63.) Deputy Sullivan also found two loaded firearms on Defendant during the traffic stop which, as testified to by Deputy Sullivan, are tools of the drug trade, and Deputy Sullivan also saw a blow torch on the center console which, again according to Deputy Sullivan, is consistent with smoking narcotics. (Filing No. 63.) The Magistrate Judge further found that because Deputy Sullivan had probable cause for Defendant's arrest (based on being a felon in possession of a firearm), the narcotics would have been inevitably discovered when the vehicle was towed and inventoried by law enforcement. (Filing No. 63.)

Defendant filed his Objection to the Magistrate Judge's Findings and Recommendation on November 22, 2024, setting forth numerous objections. (Filing No. 107.) The Objection also contained a request for a supplemental hearing. As grounds for the supplemental hearing, Defendant stated his new counsel—who was appointed following the evidentiary hearing before

the Magistrate Judge on the Motion to Suppress—retained an expert who prepared a video rendering which showed that Deputy Sullivan interrupted or terminated his BWC during the search. Defendant stated that Deputy Sullivan did not document this interruption/termination as required by the Hall County Sheriff's Department's standard operating procedures. Defendant argued that due to these interruptions and terminations in the recording, as well as Deputy Sullivan's failure to document them, Deputy Sullivan's BWC footage and testimony was not reliable or credible and could not support the denial of Defendant's Motion to Suppress. The Court granted Defendant's request for a supplemental hearing, which was held before the undersigned on April 29, 2025.

At the supplemental hearing, Defendant's expert witness, Michael Primeau ("Primeau"), testified that in his opinion, there was no evidence that footage was edited or intentionally deleted. He also testified that the footage was an accurate representation of what occurred. However, he stated that a dissimilar methodology was used to record the fifth file of BWC footage (Filing No. 60, Ex. 5) and there was no way to verify that the BWC footage was acquired directly from Deputy Sullivan's BWC. The fifth file contained partial footage of the search of Defendant's vehicle after Deputy Sullivan observed the backpack, but forty-one minutes of the recording was missing. Primeau acknowledged that at the time the video stopped, there is no indication Deputy Sullivan's hands were near his camera and that cameras can be deactivated from external factors or other things bumping into them.

The government's expert, Brandon Warner ("Warner"), testified that there is no evidence that Deputy Sullivan manually deactivated his BWC. Warner explained that if a BWC is turned off, the cruiser camera will also turn off if everything is paired correctly—the system is designed to work together. Here, the cruiser camera stayed on the entire time. (Filing No. 60, Ex. 6; Filing No. 125, Exs. 101, 102.) Also, there is white text when the BWC video resumes, which Warner testified means the BWC was not pairing correctly. (Filing No. 125, Exs. 101, 102.) Warner further explained that the footage was authentic because only the BWC Deputy Sullivan was using could have written to the network video recording system based on the serial number associated with the footage—no other device could have done it. Warner also explained that the BWC footage was on separate files per the system manufacturer to make uploads easier.

**STANDARD OF REVIEW**

Pursuant to 28 U.S.C. § 636(b)(1), when a party objects to a proposed findings of fact and recommendation by a magistrate judge, the Court must "make a de novo determination of those portions . . . to which objection is made." *Id. See also Gonzales-Perez v. Harper*, 241 F.3d 633, 636 (8th Cir. 2001) ("When a party timely objects to a magistrate judge's report and recommendation, the district court is required to make a de novo review of the record related to the objections . . ."). The reviewing district court judge is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see* Fed. R. Crim. P. 59(b)(3). If desired, a reviewing district court judge may also "receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

When a party contests a magistrate judge's findings that resulted from an evidentiary hearing, the reviewing district court judge does not need to conduct another hearing. *See United States v. Raddatz*, 447 U.S. 667, 674 (1980) (holding that 28 U.S.C. § 636 "calls for a de novo determination, not a de novo hearing"). Instead, the district court discharges its duty by, at a minimum, listening to a tape recording or reading a transcript of the evidentiary hearing. *See United States v. Azure*, 539 F.3d 904, 910–11 (8th Cir. 2008). Here, the Court conducted a supplemental hearing on Defendant's Objection based on his new counsel's retention of an expert and Defendant's arguments pertaining to the legitimacy of the video recording of the traffic stop and questions concerning Deputy Sullivan's credibility. The Court has also read the transcript of the first hearing and reviewed all exhibits.

**DISCUSSION**

Defendant has raised several objections pertaining to the Findings and Recommendation issued by the Magistrate Judge. Defendant objects to the following: (1) the finding that Deputy Sullivan's testimony was credible; (2) various factual findings related to the search of Defendant's vehicle; (3) evidentiary rulings on Defendant's objections to Deputy Sullivan's testimony; (4) findings regarding probable cause to search Defendant's vehicle; and (5) findings regarding the inevitable discovery doctrine. In addition to these objections, Defendant argues Deputy Sullivan's BWC footage and testimony is not reliable or credible and cannot support the denial of Defendant's Motion to Suppress. The Court will address the issues surrounding the BWC footage first.

1. **Deputy Sullivan's Body Camera Footage**

At the first hearing, two sources of video were offered into evidence—evidence from Deputy Sullivan's cruiser (which captured events through the front windshield of the cruiser) (Filing No. 60, Ex. 6) and Deputy Sullivan's BWC. (Filing No. 60, Exs. 1-5.) As to the BWC footage, forty-one minutes of the traffic stop were not captured. The missing footage covered the period when Deputy Sullivan was conducting the probable cause search of Defendant's vehicle—which was following his observation and location of the vacuum sealed bag in Defendant's vehicle and his call to dispatch about finding narcotics.[2] (Filing No. 60, Exs. 4, 5; Filing No. 62.) Deputy Sullivan testified that the BWC system he used at the time "was not overly reliable." (Filing No. 62.) Also, when asked why some footage was not captured, Deputy Sullivan responded, "the technical system. The body camera is having gliches. I couldn't—I don't have the training to understand what's going on there." (Filing No. 62.) Deputy Sullivan testified, however, that the existing clips were true and accurate depictions of his work and interaction with Defendant. (Filing No. 62.)

Defendant contends the BWC footage cannot be used as evidence to support the denial of the Motion to Suppress because it is unreliable, and that Deputy Sullivan purposely deactivated his BWC. However, there is no evidence in the record to support Defendant's theory. At the supplemental hearing, Defendant's expert—Primeau—testified there was no evidence that footage was edited or intentionally deleted. He also testified that the footage was an accurate representation of what occurred. Although Primeau determined there was no way to verify that the BWC footage was acquired directly from Deputy Sullivan's BWC, Primeau could not definitively say that Deputy Sullivan manually deactivated his camera. Primeau acknowledged that Deputy Sullivan's hands were not by his BWC at the time the video stopped, but also testified that sometimes there is a delay between when a button is pushed on a camera and when the recording stops.

The government's expert—Warner—did, however, testify that there is no evidence that Deputy Sullivan manually deactivated his BWC. Warner explained that if a BWC is turned off,

---

[2]Another officer, Officer Herrold, had his body worn camera on while on scene. (Filing No. 125, Exs. 101, 102.) Also, Deputy Sullivan's in-car camera—which was pointed directly at the back of Defendant's vehicle—was on the entire time. (Filing No. 60, Ex. 6; Filing No. 125, Exs. 101, 102.)

the cruiser camera will also turn off if everything is paired correctly—the system is designed to work together. Here, the cruiser camera stayed on the entire time. Also, there is white text when the BWC video resumes, which Warner testified means the BWC was not pairing correctly. Moreover, Warner explained that the footage was authentic because only the BWC Deputy Sullivan was using could have written to the network video recording system based on the serial number associated with the footage—no other device could have done it.

After hearing all the evidence, the Court finds the BWC footage is reliable and can be used to support a finding of probable cause. The Court agrees there is no evidence Deputy Sullivan purposely deactivated his BWC or that the BWC did not accurately reflect the series of events. There is no evidence anything was intentionally deleted or edited. Although certain footage is missing, there is no evidence that Deputy Sullivan purposefully deactivated his camera or that something nefarious was afoot. Logically, you would think that the footage of Deputy Sullivan peering into the vehicle before opening the door would also have been deleted if officers were trying to hide something. Not to mention that the other officers on scene had their body cameras on, including the officer who helped search Defendant's vehicle. Also, as will be explained below, the footage captured is consistent with Deputy Sullivan's testimony regarding how events unfolded during the traffic stop. Therefore, Defendant's objection to the BWC footage will be overruled.

### 2. Deputy Sullivan's Credibility

Defendant argues the Magistrate Judge incorrectly found Deputy Sullivan credible because his testimony is inconsistent with his BWC footage. Defendant asserts the BWC footage does not show any vacuum sealed bags or packaging until Deputy Sullivan began searching the vehicle after concluding he had probable cause to do so. Further, Defendant contends Deputy Sullivan is not credible because he purposely turned-off his BWC.

First, as explained above, there is no indication that Deputy Sullivan purposefully turned-off his camera. Therefore, the fact that there is missing BWC footage does not cast doubt on Deputy Sullivan's credibility. Deputy Sullivan testified that he does not know why footage is missing, and there is no evidence to support the conclusion that Deputy Sullivan's testimony in

this regard is false. There is no evidence that anything was intentionally deleted or that the video is not an accurate depiction of what Deputy Sullivan observed.[3]

Second, although the BWC footage does not clearly show the entirety of what Deputy Sullivan observed, this does not mean that Deputy Sullivan was being dishonest. Deputy Sullivan's vantage point was higher than that reflected by the recording—given Deputy Sullivan's height and the camera's placement on Deputy Sullivan's chest. Also, the vehicle's tinted windows and sun glare impacted the quality of the recording. The Magistrate Judge indicated in her Findings and Recommendation that she was unable conclude that the vacuum sealed package was visible based on the video alone given the quality of the recording, which is understandable. However, despite the quality and angle of the recording, the undersigned was able to see the open backpack and items within the backpack, one of which appeared to be a clear plastic object, at the time Deputy Sullivan's BWC was recording through the open driver's side window. While the methamphetamine crystals were not visible on the recording, this is hardly surprising given the size of crystals and the tinted and closed passenger side windows—which were closest to the bag.

Additionally, as stated by the Magistrate Judge, Deputy Sullivan's actions as reflected in the BWC footage are consistent with his testimony. The BWC footage shows that Deputy Sullivan became focused on a bag located on the front passenger seat, and then Deputy Sullivan moved to the passenger side of the vehicle to inspect the bag through the passenger side window. (Filing No. 60, Ex. 4.) After he did so, he left to retrieve gloves from his cruiser and then returned to Defendant's vehicle, at which time he opened the vehicle's door and reached directly for the vacuum sealed bag. (Filing No. 60, Ex. 4.) Immediately after that, he notified dispatch that he located drugs in the vehicle. (Filing No. 60, Ex. 4.) Suffice it to say, Deputy Sullivan's testimony matches what is reflected in the BWC footage. Under the circumstances, and based on the undersigned's own observations, the Court finds Deputy Sullivan's testimony credible.

---

[3]Defendant also argues that Deputy Sullivan failed to document that his BWC was not operating as required by department procedure. However, there is no evidence that Deputy Sullivan was aware there was a problem with the recording until this issue was raised in this case. Therefore, this argument is unpersuasive.

### 3. Factual Findings

Defendant contends that several of the Magistrate Judge's factual findings were not supported by the record because Deputy Sullivan's testimony was not credible. In particular, Defendant takes issue with the following findings: (1) "while Deputy Sullivan's K9 officer was performing his sniff, Deputy Sullivan first observed part of what he believed was a plastic vacuum sealed package in an open green backpack located on the front passenger seat of the vehicle;" (2) "Deputy Sullivan observed suspicious packaging from various angles through the vehicle windows;" (3) "while outside the vehicle looking in, Deputy Sullivan observed small amounts of fine white crystalline powder collected in the seams and folds of the packaging;" (4) "after making this observation, and after opening the driver's side door, Deputy Sullivan reached to the passenger side, and retrieved the vacuum sealed packaging he had previously observed;" (5) "Deputy Sullivan credibly testified that from various angles outside of the vehicle, he saw a plastic vacuum sealed package in an open green backpack;" and (6) "Deputy Sullivan credibly testified that he was able to see small amounts of fine white crystalline power in the seams and folds of the packaging." (Filing No. 107.)

As previously stated, the Court finds that Deputy Sullivan's testimony was credible. Therefore, the Magistrate Judge's reliance on Deputy Sullivan's testimony does not make her factual findings inaccurate. Further, the video evidence corroborates Deputy Sullivan's testimony. And, as explained above, the undersigned was able to see the plastic object in the bag in the BWC footage—which further supports the Magistrate Judge's conclusions. Therefore, Defendant's objections to the Magistrate Judge's factual findings will be overruled.

### 4. Evidentiary Rulings Made During First Hearing

Defendant takes issue with several of the Magistrate Judge's evidentiary rulings during the hearing. Defendant argues the Magistrate Judge improperly overruled his relevancy objection to the government's questioning of Deputy Sullivan regarding intelligence related to the Residence because the Residence was not associated with Defendant. Defendant also argues the Magistrate Judge incorrectly overruled his objections to testimony about the "hand-to-hand" drug transaction near Defendant's vehicle. Defendant objected to this line of questioning based on speculation,

contending that Deputy Sullivan did not have a clear view of the supposed "hand-to-hand" interaction.

Although the rules of evidence do not apply in suppression proceedings, "this does not mean that there are no standards whatsoever." *United States v. Golden*, 418 F. Supp. 3d 416, 421 (D. Minn. 2019). "The evidence on which the Court relies in ruling on a suppression motion must still be sufficiently reliable and probative." *Id.* See also *United States v. Boyce*, 797 F.2d 691, 693 (8th Cir. 1986) ("[T]he trial court may accept hearsay evidence at a suppression hearing if the court is satisfied that the statements were made and that there is nothing to raise serious doubt about their truthfulness"). Here, the Court finds this standard has been met. Defendant's association with the Residence was relevant to the question of whether there was reasonable suspicion or probable cause to believe Defendant was engaged in drug activity. *See United States v. Spotts*, 275 F.3d 714, 719 (8th Cir. 2002) (finding there was reasonable suspicion to stop vehicle that was leaving a house that was under surveillance for drug activity). Also, Deputy Sullivan's testimony regarding the "hand-to-hand" interaction was not based on speculation, but rather his training and experience as a law enforcement officer. Therefore, Defendant's objections related to the Magistrate Judge's evidentiary rulings will be overruled.

### 5. Probable Cause to Search

Defendant argues the Magistrate Judge improperly found that Deputy Sullivan had probable cause to seize the bag and search the vehicle pursuant to the automobile exception. Defendant argues this finding is not supported by the record because Deputy Sullivan is not credible, and his testimony was contradicted by his BWC footage. Defendant maintains a vacuum sealed bag containing methamphetamine residue was not in plain view as Deputy Sullivan testified.

Warrantless searches, meaning searches conducted "without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quotation omitted). One such exception to the warrant requirement is the automobile exception, which permits officers to search a vehicle if they have probable cause to believe the vehicle contains evidence of criminal activity. *United States v. Davis*, 569 F.3d 813, 816 (8th Cir.

11

2009). "Probable cause exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Cortez-Palomino*, 438 F.3d 910, 913 (8th Cir. 2006) (internal quotation omitted). If probable cause justifies the search of a vehicle, "it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Coleman*, 700 F.3d 329, 336 (8th Cir. 2012) (quotation omitted).

Items in plain view within a vehicle can establish the probable cause necessary to search a vehicle under the automobile exception. *See United States v. Fladten*, 230 F.3d 1083, 1086 (8th Cir. 2000) (finding probable cause to search a vehicle under the automobile exception where an item commonly used in the manufacture of methamphetamine was in plain view in the back seat of the vehicle). Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *United States v. Class*, 883 F.3d 734, 737 (8th Cir. 2018) (quotation omitted). An object's incriminating character is immediately apparent "if there is probable cause to associate the property seized with criminal activity." *United States v. Newton*, 788 F.2d 1392, 1395 (8th Cir. 1986) (quotation omitted).

The Magistrate Judge determined that due to the glare from the window, the position of the BWC footage, and overall picture quality, she could not conclude based on the video alone that the vacuum sealed package was visible in the bag or that it contained methamphetamine residue. However, she found that the video evidence was consistent with Deputy Sullivan's testimony—which she found to be credible. Unlike the Magistrate Judge, the undersigned was able to see the package in the bag in the BWC footage, but the undersigned was unable to see methamphetamine crystals, given their size and the quality of the recording. However, just because the Court could not see the crystals, does not mean they were not there. Deputy Sullivan credibly testified regarding his observations and, based on his training and experience, it was apparent to him that the residue he observed was consistent with methamphetamine. There was probable cause to search the vehicle.[4]

---

[4] The Magistrate Judge also concluded that even if the absence of this visible drug evidence, the totality of the circumstances supplied the requisite probable cause to search the vehicle. Because the Court has found the automobile exception justified the search based on Deputy Sullivan's observation of narcotics in plain view, the Court need not address the Magistrate Judge's alternate basis for her probable cause finding. However, given Deputy Sullivan's

### 6. Inevitable Discovery

The Magistrate Judge concluded that even if Deputy Sullivan did not have probable cause to search the vehicle, the evidence discovered during the warrantless search would have been acquired by lawful means and thus the evidence would still be admissible under the inevitable discovery doctrine. The inevitable-discovery doctrine applies if the "evidence would have been acquired by lawful means had the unlawful search not occurred but in fact was not acquired (or reacquired) by these lawful means." *United States v. Baez*, 983 F.3d 1029, 1038 (8th Cir. 2020). Underlying this doctrine is "the principle that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied." *Id*. (quotation omitted). For the inevitable discovery doctrine to apply, "the government must prove, by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Smith*, 21 F.4th 510, 517 (8th Cir. 2021).

At the time Deputy Sullivan ran his K-9 around the vehicle, he was waiting for Defendant's criminal history check to come back from dispatch. After Deputy Sullivan found the vacuum sealed bag and the drugs in Defendant's vehicle, he learned from dispatch that Defendant was a convicted felon. At that point, Deputy Sullivan had probable cause to arrest Defendant for being a convicted felon in possession of a firearm. Upon his arrest, Defendant's vehicle would have been towed from the scene. (Filing No. 60, Ex. 14; Filing No. 62; Filing No. 125, Ex. 108.) Pursuant to the Hall County Sheriff's Department standard operating procedures, an inventory search of the vehicle would have been performed. (Filing No. 60, Ex. 14; Filing No. 50-8; Filing No. 62; Filing No. 125, Ex. 108.) This search would have included any areas in which valuables could have been held, including the bag in the front seat of the vehicle. (Filing No. 60, Ex. 14; Filing No. 50-8.) The contraband located during the search of the vehicle was found in areas that would have been searched during the inventory process. (Filing No. 62.) The government has met its burden by a preponderance of the evidence that there was reasonable probability that the evidence would have

---

preexisting knowledge about the Residence, including its association with individuals engaged in drug activity, as well as Deputy Sullivan's observations of Defendant's interactions and activities leading up to the traffic stop and Defendant's possession of two loaded firearms at the time of the stop, this Court would find there was probable cause to search as there was a fair probability that contraband or evidence of a crime would be found inside the vehicle.

been discovered and the government was pursuing a substantial, alternative line of investigation. Therefore, even in the absence of probable cause to search the vehicle, the methamphetamine and other contraband items would have been inevitably discovered.

Accordingly,

**IT IS ORDERED:**

1. Defendant's Objection to the Magistrate Judge's Findings and Recommendation ([Filing No. 107](#)) is overruled.

2. The Magistrate Judge's Findings and Recommendation ([Filing No. 63](#)) is adopted in its entirety.

3. Defendant's Motion to Suppress ([Filing No. 42](#)) is denied.

4. A separate trial setting order will be entered.

Dated this 29th day of May, 2025.

BY THE COURT:

Susan M. Bazis
United States District Judge